ORDERED.

Dated: June 05, 2023

_Catherine M<sup>c</sup>Ewen_
Catherine Peek McEwen
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
www.flmb.uscourts.gov

In re:                                                                              Case No. 8:21-bk-02588-CPM

Work Cat Florida, LLC,                                                  Chapter 7

    Debtor.
_____/

**MEMORANDUM OPINION SUPPLEMENTING ORDER SUSTAINING TRUSTEE'S OBJECTION TO CLAIM NO. 1 OF LOUISIANA INTERNATIONAL MARINE, LLC**[1]

Under applicable maritime law, one who provides necessary services and supplies to a vessel has a lien on the vessel and her "appurtenances." The question here is whether cargo containers on board a flat deck cargo barge constitute appurtenances to that vessel for purposes of this type of lien. Navigating case law on such a lien leads into murky waters and down slippery slopes. But after wading through an ocean of divergent opinions, the Court's answer to this question is no.

---

[1] This opinion supplements a prior Court order (Doc. No. 410) that sustained the chapter 7 trustee's objection to the proof of claim of Louisiana International Marine, LLC "for the reasons stated orally and recorded in open court that shall constitute the decision of the Court" and reserved jurisdiction to enter a memorandum opinion. The preamble of that order references hearings held on January 19 and 30, 2023. However, with respect to the primary issue addressed in this memorandum opinion (i.e., the extent of a maritime lien for services and supplies), the Court made a "tentative" oral ruling in open court on December 29, 2022. The prior ruling was tentative in part because the Court had not yet reviewed LIM's supplemental response (Doc. No. 370) to the trustee's objection to LIM's claim, which response was filed on the eve of the hearing. Shortly after the December 29th hearing, in addition to reviewing this response, the Court reviewed related papers filed after the hearing by the trustee and LIM (Docs. No. 376 and 378, respectively). This memorandum opinion expands upon that tentative ruling after review of LIM's supplemental filing.

*Background*

By way of factual background, the Debtor in this chapter 7 case, Work Cat Florida, LLC, previously operated what it describes as a "short term shipping operation [providing] trans-Gulf of Mexico container and roll-on/roll-off freight transportation services between the ports of Tampa, Florida and Brownsville, Texas."[2] In connection with that business, Louisiana International Marine, LLC ("LIM") entered into a contract with the Debtor to provide towing services for two flat deck cargo barges, the Atlanta Bridge and Memphis Bridge. Both barges are owned by a third party and were hired out for use by the Debtor. While one of LIM's tugboats, La Commander, was towing the Atlanta Bridge, the tugboat collided with her.

Shortly after that collision, the Debtor commenced this bankruptcy case, in which LIM has filed a proof of claim for unpaid invoices. LIM contends that its claim is secured by cargo containers that were owned by the Debtor and on board the Atlanta Bridge while La Commander was towing her, based on LIM's assertion of a maritime lien against the Atlanta Bridge and her appurtenances. The chapter 7 trustee objected to LIM's claim, disputing that it is secured by the containers.[3]

In support of its lien against the Atlanta Bridge, LIM relies on 46 U.S.C. § 31342, which states that "a person providing necessaries to a [privately owned] vessel on the order of the owner or a person authorized by the owner . . . has a maritime lien on the vessel." Under this statute, "necessaries" include certain services and supplies provided to a vessel.[4] The Debtor has not

---

[2] *See* Debtor's Chapter 11 Case Management Summary (Doc. No. 5).
[3] Objection to Claim No. 1 Filed by Louisiana International Marine, LLC (Doc. No. 335). Because the chapter 7 trustee has since sold the containers, LIM seeks recovery of the proceeds from that sale.
[4] The term "necessaries," as defined in 46 U.S.C. § 31301, "includes repairs, supplies, towage, and the use of a dry dock or marine railway." This term "has been liberally construed to include what is reasonably needed in the ship's business, . . . such as goods or services that are useful to the vessel, keep her out of danger, and enable her to perform her particular function." *Bradford Marine, Inc. v. M/V Sea Falcon, Her Engines, Tackle, Apparel and other Appurtenances,* 64 F.3d 585, 589 (11th Cir. 1995) (citations omitted).

disputed that LIM provided "necessaries" to the Atlanta Bridge. Further, the Debtor has not disputed that LIM provided the same on the order of the Debtor as authorized by the barge owner. Thus, the only issue in dispute is whether a lien on the Atlanta Bridge extends to the Debtor's cargo containers.[5]

### *Defining a Vessel and Her Appurtenances in the Context of a Maritime Lien*

Since the inception of maritime liens, courts have struggled with how to define what constitutes a vessel and what goes with her. Because the word "vessel," standing alone, does not describe what it includes, transactions concerning vessels were sometimes drafted describing, for example, a sailing vessel as "the ship, her tackle, apparel, and furniture," with the understanding that the rigging was the tackle, the sails her apparel, and "the anchor and the numerous utensils for the ship's use" her furniture.[6] At some point, the word "appurtenance" began to appear and was sometimes used in addition to and sometimes in lieu of "tackle, apparel, and furniture."[7]

The determination of whether something is appurtenant to a vessel in the context of a maritime lien is typically made on a case-by-case basis and, as one court noted, it is made "without great consistency of results."[8] That is likely due to the absence of a uniform — or uniformly applied — set of criteria to guide the courts that have been called upon to make such a determination. To be sure, courts do uniformly agree that ownership of the equipment at issue is not dispositive and, in limited circumstances, the equipment need not actually be on board the

---

[5] LIM's claim of lien against the Atlanta Bridge is being challenged by the barge's owner in litigation outside of bankruptcy. If that claim is denied, LIM can have no lien on the cargo containers, regardless, because LIM has no independent basis (apart from a lien on the vessel) to claim a lien on the containers.
[6] 1 Benedict on Admiralty § 167 (2022).
[7] *Id.*
[8] *Gowen, Inc. v. F/V Quality One,* 244 F.2d 64, 68 (1st Cir. 2001) (citation omitted).

ship when the lien attaches.[9]  Beyond that, however, judicial decisions in this area of law are all over the chart, traveling many different routes to identify what constitutes an appurtenance.

One reason for the inconsistency may be that maritime liens on vessels arise under many different circumstances,[10] but courts frequently analyze what constitutes an appurtenance without much, if any, discussion about the purpose or history of the particular type of maritime lien at issue in the case.  And courts, including those considering a lien for the provision of services and supplies, routinely cite with favor definitions of appurtenances from case law involving other types of liens.[11]  This practice may well contribute to the inconsistencies that appear in different decisions dealing with what constitutes an appurtenance with respect to any particular maritime lien, because different types of maritime liens have distinct origins and histories.[12]  In other words, one size does not fit all in this context.

Factors courts have considered in deciding what qualifies as an appurtenance for purposes of a maritime lien include: (1) how the equipment in question relates to the vessel with

---

[9] *See, e.g., Gonzalez v. M/V Destiny Panama,* 102 F. Supp. 2d 1352 (S.D. Fla. 2000); *Stewart & Stevenson Svcs., Inc. v. M/V Chris Way MacMillan,* 890 F. Supp. 552 (N.D. Miss. 1995).

[10] Maritime liens may arise, for example, for the provision of services and supplies, from damages as a result of maritime torts, for past-due wages of the vessel's crew, for salvage work, and for ship mortgages.  *See* 46 U.S.C. § 31301(5) (defining "preferred maritime lien"). *See also The Frolic,* 148 F. 921 (D. R.I. 1906) (involving vessel forfeiture for violation of "Chinese exclusion acts").  Further, appurtenances are also decided in contexts other than liens.  *See, e.g., Anderson v. United States,* 317 F.3d 1235 (11th Cir. 2003) (personal injury claim under the Federal Tort Claims Act); *In re Pacific Far East Line, Inc.,* 314 F. Supp. 1339 (N.D. Cal. 1970) (vessel owner's limitation of liability to third parties for loss or destruction of goods or merchandise aboard the vessel).

[11] *See, e.g., Motor-Services Hugo Stamp, Inc. v. M/V Regal Empress,* 165 Fed. App'x 837 (11th Cir. 2006) and *Rybovich Boat Company v. M/Y Blue Star,* 2021 WL 5566518 (S.D. Fla. Nov. 29, 2021) (both deal with liens for "necessaries" yet cite *Gonzalez,* 102 F. Supp. 2d at 1356, involving a lien based on a wrongful death claim).

[12] For example, as noted in *Gonzalez,* "underlying the arrest of a vessel in the first instance is the fiction" that "[t]he offending ship is considered herself the wrongdoer, and is herself bound to make compensation for the wrong done," and the party that owns a particular appurtenance is of no consequence. *Gonzalez,* 102 F. Supp. 2d at 1356  (citations omitted).  A lien for the provision for goods and services, on the other hand, "balances the interests of keeping ships active and protecting maritime businesses who provide goods and services on credit." *Motor-Services Hugo Stamp, Inc.,* 165 Fed. App'x at 840. *See also The Mildred,* 43 F. 393, 395 (E.D. Mich. 1890) ("[I]t would be throwing a needless obstacle in the way of maritime commerce to hold that a master could not hire, nor an owner lend, personal property for the use of the vessel except at the risk of it becoming a part such vessel and liable for its debts.").

respect to what purpose the equipment serves — e.g., whether it must relate to the vessel's "navigation and operation" or whether it need only relate to its "mission;" (2) how to define a vessel's "mission;" (3) how critical the equipment must be to the vessel; (4) the value of the equipment and how its removal would impact the value of the vessel; and (5) whether the equipment must be "destined for use aboard a specifically identifiable vessel." Examples of these various approaches are discussed below. In short, it is fair to say that the lack of any consistent or uniform methodology presents a substantial challenge when attempting to identify what constitutes an appurtenance to a specific vessel.[13]

### 1. *Relationship of the Equipment to the Vessel*

Among the inconsistencies in this area of law is the description of how the equipment or item in question relates to the subject vessel in the context of the purpose the equipment serves. In an Eleventh Circuit decision involving a lien similar to the one in play here — which decision appears to be the court's most recent ruling on appurtenances — the court observed that it is "[a] fundamental principle of the maritime lien system that the vessel itself, along with all equipment on board that is essential to the ship's navigation and operation is subject to maritime liens."[14] Note that the phrase "*navigation and operation*" uses the conjunctive word "and," meaning the equipment must be essential to both the vessel's navigation and its operation. Yet, the court ultimately concluded that equipment providing telecommunications and Internet access for a cruise ship's passengers and crew was appurtenant to the vessel, not stating that such equipment

---

[13] This Court hopes that the Eleventh Circuit Court of Appeals will one day (maybe in this very case) issue an opinion that charts a clearer course for courts to follow in determining what constitutes an appurtenance for purposes of a maritime lien on a vessel under 46 U.S.C. § 31342.

[14] *Motor-Services Hugo Stamp, Inc.,* 165 Fed. App'x at 840. *See also* 1 Benedict on Admiralty §167 ("The trend in modern cases is to consider the vessel itself and all equipment that is an integral part of the vessel and essential to its *navigation and operation* as the res subject to preferred maritime liens.") (emphasis added).

was essential to the ship's "navigation and operation" (although surely it was), but rather because it was "essential to the vessel's *mission.*"[15]

In an earlier decision — albeit in context of a tort claim and involving a government vessel — the Eleventh Circuit described an appurtenance as any item "essential to the vessel's *navigation, operation, or mission.*"[16] This phrasing seems the most prevalent both within this circuit and nationwide in dealing with liens against vessels, regardless of the particular type of lien at issue.

What appears to be a potential conflict between the phrase "navigation and operation" and the phrase "navigation, operation, or mission," may be resolved, in part, if one construes "operation" as referring to both how a vessel operates mechanically and for what purpose.[17] Such construction does not, however, resolve use of "and" versus "or." Whether the Eleventh Circuit would adopt a test using "or" in the context of a lien for the provision of services and supplies has yet to be seen. It has not done so to date. In any event, neither adding a ship's mission into the equation (either as an aspect of its operation or standing alone) nor using the disjunctive "or" affects the outcome here based on the facts of this case.

### 2. The Vessel's Mission

When a vessel's mission *is* part of the equation for purpose of identifying an appurtenance in any maritime lien context, case law on this topic proves particularly difficult to traverse because the compass points in multiple, different directions. Some decisions focus on the single primary purpose for which the vessel was originally designed or specially redesigned to serve. Other decisions equate the vessel's mission with the purpose of the particular voyage

---

[15] *Motor-Services Hugo Stamp, Inc.,* 165 Fed. App'x at 840 (emphasis added).
[16] *Anderson,* 317 F.3d at 1238 (emphasis added).
[17] Merriam-Webster, https://www.merriam-webster.com/dictionary/operation (defining "operation" as "the act, process, method, or result of operating") (last visited May 9, 2023).

on which the vessel was embarked when the lien attached. Still others describe the vessel's mission in subjective or vague terms. And in at least one decision, the court identified a vessel as having multiple purposes and, consequently, multiple missions.

This first line of decisions includes the obvious, such as a decision describing the mission of a fishing vessel as — no surprise — to engage in fishing operations.[18] Another decision in this line describes the mission of a ship retrofitted with equipment necessary for loading, bagging, and unloading cement as to operate as a bulk cement carrier.[19] And the mission of a steamship within which a refrigeration plant had been installed for over 25 years has been described as to operate as a refrigerating vessel.[20]

Decisions that look to the purpose of the particular voyage upon which a vessel was engaged when the lien attached include one concerning a vessel with special dive gear on board, the mission of which was to embark on a pearl fishing expedition,[21] and another involving a schooner on which wrecking (salvage) equipment was kept, the mission of which was to be used for wrecking purposes "whenever occasion required it."[22] Also among these decisions is one from the Eleventh Circuit addressing a claim under the Federal Tort Claims Act (FTCA) for personal injury resulting from a bomb dropped by an aircraft stationed on an aircraft carrier engaged in bombing exercises. There, the court determined that the aircraft qualified as appurtenances under the FTCA,[23] and it seems completely reasonable to expect that the United States, as owner of the aircraft carrier, would be responsible for this injury from a tort

---

[18] *United States v. F/V Sylvester F. Whalen,* 217 F. Supp. 916, 917 (D. Me. 1963).
[19] *Nat'l Western Life Ins. Co. v. Tropical Commerce Corp. (The SS Tropic Breeze)*, 456 F.2d 137, 141 (1st Cir. 1972).
[20] *Turner v. United States,* 27 F.2d 134, 135 (2d Cir. 1928).
[21] *The Witch Queen,* 3 Sawy. 201 (D. Cal. 1874). It is unclear from this decision how often the vessel was used for pearl fishing. However, references to "the objects of the particular voyage she was about to enter upon," "the voyage contemplated," and "this enterprise," indicate that the court focused on the specific outing undertaken at the time the lien attached.
[22] *The Edwin Post,* 11 F. 602, 605 (D. Del. 1882).
[23] *Anderson,* 317 F.3d at 1238.

perspective. Yet, when viewed in the context of maritime commerce, it seems far less reasonable for one who provides services or supplies to an aircraft carrier to have or expect a lien on whatever aircraft happened to be assigned to that carrier at the time the services or supplies were provided. In a case involving a lien for services and supplies, the Eleventh Circuit cited case law for the proposition that appurtenances include "equipment essential to the completion of the voyage upon which it is embarked."[24] That decision, however, dealt with telecommunications equipment, which was unquestionably essential to the ship's navigation and operation,[25] regardless of the particular voyage the ship was on.

In the third group of decisions is one describing the mission of a high-end "pleasure yacht" as "to bring pleasure to its occupants." Recognizing that "pleasure can come in many different shapes and sizes," the court in that case determined that paintings secured to the walls of the yacht were appurtenances because they afford a "sense of sophisticated refinement" and contribute, together with other features of the vessel, to "the luxurious look and feel of the place."[26] In another case, the court concluded that liquor on board a cruise ship qualified as an appurtenance because "[o]ne could hardly imagine a successful recreational luxury cruise without the free flow of food and accessible alcoholic and other beverages," describing the provision of "recreational dining" as "at least one of the primary missions of this vessel."[27] This Court reads both of these cases as, in effect, suggesting a vessel's mission might be, or include, meeting the expectations and/or enhancing the experience of its passengers (as opposed to a mission of simply transporting passengers on the water). If this were the true test, though, where would the lien on a pleasure yacht or cruise ship end? Would it cover the crystal

---

[24] *Motor-Services Hugo Stamp, Inc.,* 165 Fed. App'x at 840.
[25] *Id. See also Motor-Services Hugo Stamp, Inc. v. M/V Regal Empress,* No. 8:03-cv-703-24 (M.D. Fla. May 20, 2003) (Doc. No. 188) (this ship's telecommunications equipment was "used as part of the operation and navigation of the vessel as well as for the convenience of the crew and passengers").
[26] *Rybovich Boat Company v. M/Y Blue Star,* 2021 WL 5566518 (S.D. Fla. Nov. 29, 2021).
[27] *Motor-Services Hugo Stamp, Inc.,* No. 8:03-cv-703-24 (Doc. No. 188).

stemware and fine china? What about the upscale toiletries stocked in the guests' bathrooms? Would the cruise ship's baby grand piano in the atrium, its gym treadmills, and its spa's cosmetology inventory all be deemed appurtenances?

The cruise ship decision involving the discussion of liquor also provides an example of a court's identifying multiple missions. There, the court described the ship's missions (plural) as including: in connection with photo equipment and a photo lab, to provide a "memorable entertainment experience;" in connection with gambling equipment, to provide "recreational services;" and, as noted above, in connection with food and beverages, to provide "recreational dining."[28] Again, this Court wonders where a maritime lien under such a test would end, as it is difficult to imagine any item on a cruise ship, or any vessel for that matter, that does not fulfill some goal of the vessel.

Having considered each of these approaches, the Court concludes that defining a vessel's mission based on the single primary purpose for which she was designed or specially redesigned to be the most pragmatic, at least when considering a lien for services and supplies. It represents the most manageable approach for creating uniformity as to what those who provide services or supplies to a vessel on credit should understand their lien on the vessel to cover. They would not be left to guess how a court might otherwise define the scope of the vessel's mission or missions and what equipment or other items a court might deem essential to fulfilling the same. This approach also avoids slippery slopes that would result in exceptions swallowing the rule should courts continue to define a vessel's mission in terms of what passengers should likely expect to experience while on board and to identify multiple missions of a single vessel in determining whether any particular item is essential to one or more of the vessel's missions.

---

[28] *Id.*

### 3. How Critical the Equipment is to the Vessel

Further complicating attempts to define an appurtenance are decisions in which courts do not require that the equipment in question be "essential," in contrast to the many courts that do. One court in particular described as "long-standing precedent" a rule that extends a maritime lien to property based on whether it is "necessary *or beneficial* in light of the nature and mission of the subject vessel."²⁹ Could an argument not be made that virtually everything on board a vessel is somehow beneficial? Yet another slippery slope. It appears, however, that the Eleventh Circuit remains more exacting and continues to require that an appurtenance be essential.³⁰ Regardless, this particular complication is not at issue here because LIM has not asserted that the cargo containers on board the Atlanta Bridge were merely beneficial, as opposed to essential, to its mission.

### 4. The Equipment's Value

LIM has also not argued, as a basis for extending a lien on the Atlanta Bridge to cargo containers on board, that the barge's value relies heavily on those containers. Thus, the Court need not address decisions in which items were deemed appurtenances because of the relation of their value to the value of the vessel itself.³¹

### 5. Whether the Equipment is Destined for Use Onboard a Particular Vessel

In defining what constitutes an appurtenance, some courts have added — in addition to the requirement that the equipment be essential to the vessel's "navigation and operation" or to its "navigation, operation, or mission" — a requirement that the equipment in question be a

---

[29] *Canaveral Port Authority v. M/V Liquid Vegas,* 2009 WL 3347596 (M.D. Fla. 2009) (emphasis added).
[30] *See Motor-Services Hugo Stamp, Inc.,* 165 Fed. App'x at 840; *Anderson*, 317 F.3d at 1238.
[31] *See Gowen,* 244 F.2d at 68 (recognizing a lack of authority with respect to fishing permits, the court determined, for policy reasons, that they should be considered appurtenances because fishing vessels like that one at issue "are valuable significantly, and sometimes almost entirely, because of their [fishing] permits").

"specifically identifiable item that is destined for use aboard a specifically identifiable vessel."[32] For example, in a case involving a lien arising from a preferred ship mortgage, the court determined that propellers and tail shafts delivered for installation in a particular vessel were appurtenances because they "are plainly essential to her navigation and it was plainly the intention of [the vessel's owner] . . . that they be installed in [the vessel]."[33] Therefore, the court noted, it was the intent of the owner and the reasonable expectation of the lienholder that this equipment was subject to the lien.[34] When the item is not destined for use aboard a specifically identified vessel, the same cannot be said.[35] The Eleventh Circuit included this additional requirement — that the equipment in question be destined for use on board the particular vessel to which it is deemed an appurtenance — in one of its decisions, the one involving the aircraft aboard a carrier,[36] but it made no mention of it in another, the decision concerning the telecommunications equipment on a cruise ship.[37]

This Court, again looking for the most pragmatic approach in determining the proper scope of a maritime lien for the provision of services and supplies, finds the additional requirement that an appurtenance be destined for a particular vessel a useful tool in the decision-making process. It simplifies the analysis by eliminating any item not destined for use on board the specific vessel that is subject to the lien. Further, this should make for a relatively easy

---

[32] *See, e.g., Gonzalez*, 102 F. Supp. 2d at 1356.
[33] *Stewart & Stevenson Svcs., Inc,* 890 F. Supp. at 562.
[34] *Id.*
[35] *See, e.g. CRP LMC Prop Co. LLC v. Unnamed 1997 Model 55.5 Magnum Built Vessel Bearing Hull Identification No. MAG56005A797,* 2016 WL 11547497, *8 (S.D. Fla. Aug. 1, 2016) (boat hoist was not an appurtenance because, in addition to being unnecessary for the vessel's navigation, operation, or mission, "it is a portable device which can be moved from vessel to vessel much like a crane" and, therefore, "[r]egardless of how long the Vessel sat in the boat hoist in the past, it is clear that the boat hoist is not destined for use aboard the Vessel in particular.") (citations omitted).
[36] *Anderson,* 317 F.3d at 1238.
[37] *Motor-Services Hugo Stamp, Inc.,* 165 Fed. App'x at 840. *See also Container Applications, Int'l Inc. v. Lykes Bros. Steamship Co. (In re Container Applications Int'l, Inc.),* 233 F.3d 1361, 1366 (11th Cir. 2000) (cargo containers were not "provided" for purposes of 46 U.S.C. § 31342 because they were leased in bulk and not provided to any particular vessel).

determination in almost every situation.  Moreover, it coincides with what one who provides services or supplies to a vessel should reasonably expect to be covered by a lien on the vessel.

### *Strict Construction Required*

In another Eleventh Circuit decision — in which the court considered the application of 46 U.S.C. § 31342, the statute at issue in the present case —the court cited Supreme Court precedent for the proposition that "maritime liens are disfavored in the law because they are secret ones that might operate to the prejudice of prior mortgagees or of purchasers without notice."[38]  This statute is, therefore, "stricti juris and will not be extended by construction, analogy or inference."[39]

Based on a strict interpretation of this same statute, the Court will not extend a lien on a "vessel" beyond those things that are "essential" — meaning, in the traditional sense, that it is "[o]f, relating to, or involving the essence or intrinsic nature of something"[40] or "absolutely necessary; indispensable"[41] — to the vessel's "navigation, and operation" or its "navigation, operation, or mission."  And if a vessel's mission is to be taken into account, the Court construes "mission" to mean the primary function the vessel was designed or specially redesigned to perform on an ongoing basis.  Based on this construction, the Court rejects LIM's argument that the cargo containers on board the Atlanta Bridge while she was being towed by La Commander were "essential to the function of the container-carrying barges as a means of transporting cargo" and, therefore, are appurtenances covered by a lien on the barge.[42]

---

[38] *Container Applications, Int'l Inc.,* 233 F 3d at 1366 (citing *Piedmont & George's Creek Coal Co. v. Seaboard Fisheries Co.,* 254 U.S. 1 (1920)) (dealing with whether a lien arose under this statute, not the extent of such lien).
[39] *Id.*
[40] *Essential,* Black's Law Dictionary (10th ed. 2014).
[41] Merriam-Webster, https://www.merriam-webster.com/dictionary/essential ("Essential implies belonging to the very nature of a thing and, therefore, being incapable of removal without destroying the thing itself or its character.") (last visited May 9, 2023).
[42] *See* LIM's supplemental filing (Doc. No. 370).

### *Cargo Containers are Not Essential*

In determining the significance of the cargo containers on board the Atlanta Bridge, one must start with an understanding of the type of vessel she is. The Atlanta Bridge is a flat deck cargo barge, which the Court generally understands is a barge with a large flat deck designed to transport different kinds of cargo. Therefore, it appears that the big-picture mission of a flat deck cargo barge is to transport "stuff" across the water, plain and simple, regardless of what it transports on any particular voyage. If so, cargo containers temporarily on board while La Commander was towing the Atlanta Bridge are not appurtenances because, in addition to playing no role in her navigation or operation, they are not essential to her mission, which is simply to bring stuff (including containers) from dock A to dock B.

If, in fact, the Atlanta Bridge is not a typical flat deck barge and has been outfitted with specialized equipment such that she has been redesigned to function exclusively to transport cargo containers,[43] that specialized equipment might qualify as an appurtenance. But the containers themselves, which are what she is transporting with the aid of that equipment, would still not constitute appurtenances. The containers, for all intents and purposes, are cargo themselves, together with whatever is inside the containers and, if whatever is inside includes smaller containers, then together with whatever is inside those smaller containers, and so on — much like nesting dolls — all of which are the objects of the mission, meaning what the barge was hired to transport. In other words, they are no more appurtenances than are cars on board a car ferry or shrink-wrapped pallets in a ship's hold.

---

[43] *See* LIM's supplemental filing (Doc. No. 370).

*Cargo Containers are Not Specifically Identifiable*
*Items Destined for Use Aboard a Specifically Identifiable Vessel*

Cargo containers are merely a convenient means for transporting certain types of goods. Although cargo container are specifically identifiable items, they are utilized in bulk and interchangeably so. Moreover, cargo containers like the ones at issue here are completely fungible. They are constantly swapped out for one another with no concern whatsoever as to which containers will eventually end up on which barge.[44] Cargo containers are also transitory, continually moving on and off different barges, to and from different docks, where some may be loaded onto trucks and some onto railway cars to be further transported to wherever the containers will ultimately be unpacked. The particular cargo containers on board the Atlanta Bridge while she was under tow by La Commander were there by sheer happenstance, having been assigned to her randomly for a short-term trip across the Gulf. Thus, they were not "destined for use aboard a specifically identifiable vessel."

LIM has argued that even if the Debtor's cargo containers are themselves cargo, its lien on the Atlanta Bridge extends to her cargo, citing an admiralty treatise for the proposition that a maritime lien extends to her freight.[45] It is unclear, however, the context in which the referenced lien arose. And although some types of liens may extend to freight, e.g., to cover costs associated with the freight,[46] the Court is not aware of, and LIM has not cited to, any decision involving a lien for the provision of services and supplies to a vessel, as we have here, extending to her freight.

---

[44] *Cf. Container Applications, Inc.,* 233 F.3d at 1363 (cargo containers were not "provided" to a fleet of vessels for purposes of a maritime lien for services and supplies because "[the supplier/lessor of the containers] neither physically delivered the containers to the vessels nor did it direct [the fleet owner] to distribute the containers to particular vessels.").

[45] *See, e.g.,* LIM supplemental filing (Doc. 370).

[46] *See World Imports, Ltd. V. OEC Group New York (In re World Imports, Ltd.),* 820 F.3d 576, 584 (3d Cir. 2016) ("A lien for unpaid freight 'arises from the right of the ship-owner to retain the possession of the goods until the freight is paid.'") (citation omitted).

14

### *Other Cases Considering Whether Cargo Containers are Appurtenances*

The Court knows of two prior cases dealing specifically with whether cargo containers should be considered appurtenances. The first case dealt with a company that purchased a tank barge and engaged a third party to perform repair and fabrication work to convert the barge into a vessel suitable for housing a structure dubbed the Exiderdome.[47] The company used this structure, which consisted of a series of cargo containers, to exhibit its products and equipment to different markets, and conversion of the barge enabled it to transport the Exiderdome from city to city and for the Exiderdome to serve as a floating exhibit hall. There, the court ruled that a lien against the barge for the repair and fabrication work included the containers that made up the Exiderdome because that structure was critical to the barge's mission.[48] And even though the Exiderdome itself may have at times been temporarily removed from the barge, the particular containers used to create this structure remained the same, and the structure was such that it could only be housed and transported on this one barge that had been custom designed to hold it. Consequently, unlike the cargo containers at issue in the instant case, the particular containers used to construct the Exiderdome were destined for use upon one and only one particular barge.

The second case concerned refrigerated cargo containers that were on board a freighter when it collided with a tanker and sunk. In that case, the court determined, as a matter of first impression, that the cargo containers, which were owned and utilized by the owner of the freighter, although not assigned to any of the owner's particular vessels, were "part of the vessel's appurtenances for the object of the voyage and part of what the owner risked on the vessel for the object of the adventure."[49] Thus, the court concluded, the value of the containers must be included for purposes of limiting the owner's liability to third parties for losses sustained

---

[47] *Ironhead Marine, Inc. v. Barge Exiderdome No. 1,* 635 F. Supp. 2d 386 (D. N.J. 2009).
[48] *Id.* at 388.
[49] *In re Pacific Far East Line, Inc.,* 314 F. Supp. at 1350.

as a result of the collision to "the amount or value of the interest of such owner in such vessel, and her freight then pending."[50]

Both cases are distinguishable. The instant case deals with containers that are continually swapped out for one another, unlike those used to construct the Exiderdome. And it involves a lien in favor of one who provides a vessel services and supplies, not a statutory limitation of liability that looks to what the owner put at risk on the particular voyage at issue. Further, neither case is controlling here in the Eleventh Circuit.

### *Additional Arguments Raised in the Objection*

Although this opinion focuses on the extent of a maritime lien for services and supplies, the Court notes that the chapter 7 trustee raised additional arguments in his objection to LIM's secured claim. Because the Court has determined that the Debtor's cargo containers are not appurtenances, the Court need not address these secondary arguments. The Court will, however, mention them briefly for appeal purposes.

First, the trustee contends that LIM is barred from asserting a lien on the Debtor's cargo containers because LIM failed to arrest the Atlanta Bridge. The type of lien at issue here, however, by its plain language arises at the time the services and supplies are provided. Thus, any lien LIM has on the Atlanta Bridge (and any appurtenances thereto) arose when LIM provided towing services to the Atlanta Bridge. The Court, therefore, rejects this contention.

The trustee also argues that LIM's secured claim against the Debtor's cargo containers is barred because LIM provided services to the Atlanta Bridge without relying on the credit of the barge itself and, absent reliance on the barge, the lien cannot therefore extend to any of its appurtenances (assuming the containers are appurtenances, which this Court has determined they

---

[50] *Id.* (citing 46 U.S.C. § 183, which limits the liability of a vessel owner for, among other things, any loss or destruction of any property, goods, or merchandise shipped or put on board such vessel).

are not). In addition, the trustee asserts that LIM's secured claim is barred by laches. The record in this case is insufficient to determine if LIM relied, at least in part, upon the credit of the Atlanta Bridge or if laches should apply. Therefore, the Court makes no ruling with respect to these last two arguments.

## *Conclusion*

In sum, because cargo containers are not essential for a flat deck barge's navigation, operation, or its mission (and indeed are the very object of the mission), and because no individual container is destined for use on any particular barge, they do not qualify as appurtenances for purposes of a maritime lien for the provision of services and supplies. Consequently, the Court finds and concludes that any maritime lien LIM may have on the Atlanta Bridge does not extend to the Debtor's cargo containers on board while she was under tow by La Commander.

The Clerk is directed to serve a copy of this opinion on any interested parties who do not receive service via CM/ECF.